DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ACADEMY FOR POSITIVE LEARNING, INC.,** a Florida not-for-profit corporation, **PALM BEACH MARITIME MUSEUM, INC.,** a Florida not-for-profit corporation, d/b/a **PALM BEACH MARITIME ACADEMY, MARLENY OLIVO,** an individual, and **PEDRO OLIVO,** an individual,
Appellants,

v.

**SCHOOL BOARD OF PALM BEACH COUNTY, FLORIDA** and **G-STAR SCHOOL OF THE ARTS, INC.,** a Florida not-for-profit corporation,
Appellees.

No. 4D19-2816

[April 22, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 50-2019-CA-000405-XXXX-MB.

Shawn A. Arnold and Braxton A. Padgett of The Arnold Law Firm, LLC, Jacksonville, for appellants.

Jon L. Mills of Boies Schiller Flexner LLP, Miami, Stuart H. Singer and Sabria A. McElroy of Boies Schiller Flexner LLP, Fort Lauderdale, for appellee, School Board of Palm Beach County, Florida.

GROSS, J.

Is a charter school entitled to a share of ad valorem taxes collected pursuant to a 2018 referendum approved by the voters of Palm Beach County? We hold that the charter school is not so entitled and affirm the final judgment entered by the circuit court.

### *Background*

Appellants Academy for Positive Learning and Palm Beach Maritime Academy (the "Charter Schools") are charter schools located in Palm Beach County. Appellants Marleny and Pedro Olivo are parents of a public charter school student who attends Academy for Positive Learning.

## *The 2018 Referendum*

During the November 2018 election, the School Board of Palm Beach County, Florida placed a referendum on the ballot asking county voters to approve an ad valorem levy for the operational needs of non-charter District schools to fund school safety equipment, fund program teachers, and improve teacher pay. This is how the referendum appeared on the ballot:

**REFERENDUM TO APPROVE AD VALOREM LEVY FOR SCHOOL SAFETY, TEACHERS AND OPERATIONAL NEEDS**

Shall the School Board of Palm Beach County have authority to levy 1.00 mills of ad valorem millage dedicated for operational needs of non-charter District schools to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay beginning July 1, 2019 and automatically ending June 30, 2023, with oversight by the independent committee of citizens and experts?

_____Yes
_____No

The referendum expressly excluded public charter schools from receiving any revenues generated from the ad valorem tax. County voters approved the referendum, which went into effect on July 1, 2019.

The 2018 Referendum was authorized by section 1011.71(9), Florida Statutes (2018), which states:

In addition to the maximum millage levied under this section and the General Appropriations Act, a school district may levy, by local referendum or in a general election, **additional millage for school operational purposes** up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. Any such levy shall be for a maximum of 4 years and shall be counted as part of the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. Millage elections conducted under the authority granted pursuant to this section are subject to s. 1011.73.

- 2 -

**Funds generated by such additional millage do not become a part of the calculation of the Florida Education Finance Program total potential funds in 2001-2002 or any subsequent year and must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year**. If an increase in required local effort, when added to existing millage levied under the 10-mill limit, would result in a combined millage in excess of the 10-mill limit, any millage levied pursuant to this subsection shall be considered to be required local effort to the extent that the district millage would otherwise exceed the 10-mill limit.

§ 1011.71(9), Fla. Stat. (2018) (emphasis added).

No language in section 1011.71(9), as it existed in 2018, requires that funds generated by the referendum be distributed to charter schools. The only requirement for the use of "additional millage" collected as a result of the referendum is that it be used "for school operational purposes," which vests much discretion in a School Board to allocate the funds.

The 2018 Referendum at issue stated that the millage levy would be "dedicated for operational needs of non-charter District schools to fund school safety equipment, hire additional school police and mental health professionals, fund arts, music, physical education, career and choice program teachers, and improve teacher pay." This language falls under the statutory requirement to use these funds "for school operational purposes." *Id.*

In this litigation, appellants have creatively attempted to rewrite both the 2018 Referendum and section 1011.71(9). For the reasons set forth below, we reject those attempts and, instead, abide by the plain language of the referendum and statute.

### *The Underlying Litigation*

On January 10, 2019, appellants filed a complaint for declaratory and injunctive relief, requesting that the trial court (1) enter a declaratory judgment requiring the School Board to share the 2018 Referendum revenues with the Charter Schools on a pro rata basis; and (2) enjoin the School Board from denying the Charter Schools their proportionate share of the 2018 Referendum revenues. Appellants asserted that the 2018 Referendum violated Florida law by excluding charter schools because

Florida's statutory scheme mandates equal treatment of charter and non-charter schools.

Appellants and the School Board filed cross-motions for summary judgment. The parties agreed that there were no disputed factual issues and that the case involved a matter of statutory construction and constitutional interpretation. Following a hearing, the circuit court issued a thoughtful and detailed order granting the School Board's motion for summary judgment and denying appellants' motion. The court agreed with the School Board that the 2018 Referendum did not violate Florida law based on the plain language of the statutory scheme. The court later entered a final judgment in favor of the School Board, prompting this appeal.

### *Discussion*[1]

Appellants argue that the Charter Schools are entitled to a proportionate share of the revenues generated by the 2018 Referendum because: (A) section 1002.33(17), Florida Statutes (2018), requires that public charter school students be funded the same as other public school students; (B) the millage levy authorized under section 1011.71(9) is part of the "current operating discretionary millage" that must be shared with the charter schools; and (C) the passage of House Bill 7123 supports the conclusion that the School Board is required to share the 2018 Referendum revenues.[2] We consider each of these arguments in turn.

**The first sentence of the charter school funding provision in section 1002.33(17) describes the calculation method for funding students, not the source or amount of such funding**

Appellants first argue that the Charter Schools are entitled to a proportionate share of the revenues generated from the 2018 Referendum because section 1002.33(17), Florida Statutes, requires that public charter school students be funded the same as other public school students. Section 1002.33(17) provides, in pertinent part:

> **(17) Funding.--**Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are

---

[1] "The standard of review for an order granting summary judgment is de novo." *State Farm Fla. Ins. Co. v. Lime Bay Condo., Inc.*, 187 So. 3d 932, 934 (Fla. 4th DCA 2016).

[2] Appellants also rely on a circuit court order from a different circuit that is not binding on this court.

- 4 -

in a basic program or a special program, the same as students enrolled in other public schools in the school district.

§ 1002.33(17), Fla. Stat. (2018).

Appellants' treatment of the statute omits crucial words; they appear to read the statute like this: "Students enrolled in a charter school, regardless of the sponsorship, shall be funded . . . the same as students enrolled in other public schools in the school district," while ignoring the language in the middle of the sentence. As the School Board asserts, when applying basic principles of statutory construction, the modifier in the first sentence, "the same as," must be read to modify the entire nearest antecedent phrase, "shall be funded as if they are in a basic program or a special program." This rule of statutory construction "calls for a commonsense interpretation of the way in which words are put together to form phrases, clauses, or sentences." *Scherer v. Volusia Cty. Dep't of Corr.*, 171 So. 3d 135, 138 (Fla. 1st DCA 2015). The phrase "as if they are in a basic program or a special program" describes a component of the formula for determining each charter school's allocation of funds. *See* § 1011.62(1), Fla. Stat. (2018).

In addition to selectively reading the statute, appellants isolate it from its context—the statutory framework for funding schools. As pointed out by the School Board, the Florida Education Finance Program ("FEFP") allocates funds to school districts based on student enrollment and uses a unit of measurement for each student called a full-time equivalent ("FTE"). § 1011.62(1)(a), Fla. Stat. (2018). Surveys are taken each year to determine the number of students in one of several programs, which include "basic" educational programs and specified "special" programs. *Id.* Each program has an associated cost factor intended to reflect the relative cost of serving students in each program, which adds weight to the FTE. § 1011.62(1)(c), Fla. Stat. (2018). The weight increases the amount of funds a district is eligible to receive since the FTE is multiplied by the program cost factor to reach a weighted FTE. § 1011.62(1)(d), Fla. Stat. (2018).

With this context in mind, we conclude that the first sentence of section 1002.33(17) plainly requires charter school funding to take into account whether charter school students are enrolled in a "basic" or "special" education program, "the same as" is done with non-charter public school funding. Therefore, the trial court correctly reasoned that this section of the statute refers to the *method* of calculating funding, not the funding source or amount.

Appellants look to a 2004 Attorney General Opinion ("AGO") to support their interpretation of the statute. That opinion addressed the question of "whether the language of section 1002.33, Florida Statutes, requires that charter schools be funded 'the same as' other schools in the public school system." Op. Att'y Gen. Fla. 2004-67 (2005). The AGO answered the question in the affirmative, opining that "[t]he language of the statute appears to be plain and definite and the intention of the Legislature is conveyed clearly and must be followed." *Id.*

However, as the School Board argues, the AGO did not opine that charter schools are entitled to a share of funding from all of the same sources as district-operated schools and, instead, merely repeated the language of the charter school funding provision without analysis.

For these reasons, we conclude that the language of the charter school funding provision in section 1002.33(17) simply makes the method of calculating funding for charter schools and non-charter schools the same; it does not mean that the funding amount or sources of funding are the same. The circuit court did not err in determining that the Charter Schools were not entitled to receive a portion of the proceeds from the 2018 Referendum on this basis.

**The millage levy authorized under section 1011.71(9) is not part of the "current operating discretionary millage" that must be shared with the Charter Schools**

Section 1002.33(17)(b), Florida Statutes, sets forth the sources of funding for charter schools:

> (b) The basis for the agreement for funding students enrolled in a charter school **shall be the sum of the school district's operating funds from the Florida Education Finance program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds, discretionary lottery funds, and funds from the school district's current operating discretionary millage levy**; divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school[.]

§ 1002.33(17)(b), Fla. Stat. (2018) (emphasis added). Appellants contend that the 2018 Referendum revenues are part of the "current operating discretionary millage levy," and therefore must be shared with the charter schools.

This argument fails for two reasons: (1) the phrase "current operating discretionary millage levy" in section 1002.33(17)(b) refers solely to the nonvoted discretionary millage levy authorized by section 1011.71(1); and (2) the phrase "current operating discretionary millage levy" in section 1002.33(17)(b) refers to a source of funds which are a component of the FEFP funds, and does not include the separate additional millage levy authorized under section 1011.71(9), which is expressly excluded from the FEFP funds. Each of these points is addressed in turn.

1. *The phrase "Current Operating Discretionary Millage Levy" in section 1002.33(17)(b) refers to the nonvoted discretionary millage levy contemplated under section 1011.71(1)*

The Legislature's use of the phrase "current operating discretionary millage" in section 1002.33(17)(b) refers to the single nonvoted discretionary millage levy contemplated under section 1011.71(1), which states:

1011.71 District School Tax

(1) If the district school tax is not provided in the General Appropriations Act or the substantive bill implementing the General Appropriations Act, each district school board desiring to participate in the state allocation of funds for current operation as prescribed by s. 1011.62(18) shall levy on the taxable value for school purposes of the district, exclusive of millage voted under s. 9(b) or s. 12, Art. VII of the State Constitution, a millage rate not to exceed the amount certified by the commissioner as the minimum millage rate necessary to provide the district required local effort for the current year, pursuant to s. 1011.62(4)(a) 1. **In addition to the required local effort millage levy, each district school board may levy a nonvoted current operating discretionary millage**. The Legislature shall prescribe annually in the appropriations act the maximum amount of millage a district may levy.

§ 1011.71(1), Fla. Stat. (2018) (emphasis added).

This nonvoted discretionary millage levy is separate from the voted-upon millage levy authorized under section 1011.71(9),[3] pursuant to which the 2018 Referendum at issue was passed.

Again, as it existed in 2018, section 1011.71(9) provided:

> (9) In addition to the maximum millage levied under this section and the General Appropriations Act, **a school district may levy, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution**. Any such levy shall be for a maximum of 4 years and shall be counted as part of the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. Millage elections conducted under the authority granted pursuant to this section are subject to s. 1011.73. **Funds generated by such additional millage do not become a part of the calculation of the Florida Education Finance Program total potential funds in 2001-2002 or any subsequent year and must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year**. If an increase in required local effort, when added to existing millage levied under the 10-mill limit, would result in a combined millage in excess of the 10-mill limit, any millage levied pursuant to this subsection shall be considered to be required local effort to the extent that the district millage would otherwise exceed the 10-mill limit.

§ 1011.71(9), Fla. Stat. (2018) (emphasis added). Unlike the nonvoted-upon discretionary millage in subsection (1), the voted-upon millage in subsection (9) is not referred to as a "current operating discretionary millage," but is instead referred to as an "additional millage for school operational purposes." *Id.* Further, as the trial court noted below, a millage levy under subsection (9) is not discretionary, as it requires voter approval, and therefore the use of the phrase "current operating discretionary millage" in section 1002.33(17)(b) cannot be reasonably

---

[3] Section 200.001(3), Florida Statutes, which sets forth different categories of school millage rates, recognizes "nonvoted discretionary school operating millage" and "voted district school operating millage" as separate and distinct categories. § 200.001(3)(b),(c), Fla. Stat. (2018).

interpreted to refer to the additional voted-upon millage in section 1011.71(9).

This conclusion is supported by the fact that the language of section 1002.33(17)(b) predates the additional voted-upon millage in section 1011.71(9).[4] Therefore, at the time the funding provision of the charter school statute was adopted, its reference to the "current operating discretionary millage" could not have contemplated the voted-upon millage because that subsection did not exist at that time; that reference must have been solely to the nonvoted millage, now codified at section 1011.71(1). As the circuit court observed, had the Legislature intended to include the additional voted-upon millage as part of charter school funding, it could have amended the charter school statute, but there was no amendment when the voted-upon millage provision was enacted.

Appellants contend that the "express language of section 1011.71(9) specifically contemplates that the voted millage is combined with the nonvoted millage" and together make up a school district's total "current operating discretionary millage." In support of their position, appellants cite language in subsection (9) stating that "a school district may levy . . . additional millage for school operational purposes up to an amount that, **when combined with nonvoted millage** levied under this section, does not exceed the 10-mill limit . . . ." § 1011.71(9), Fla. Stat. (2018) (emphasis added).

However, the use of the word "combined" does not indicate that both the nonvoted millage and voted-upon millage together comprise the "current operating discretionary millage," as appellants suggest. Instead, the context of the sentence makes clear that the use of the word "combined" refers to the combination of the various millages for the purpose of assessing whether the combined rate complies with the overall constitutional limit on total assessed millage.

*2. The phrase "Current Operating Discretionary Millage Levy" in section 1002.33(17)(b) refers to a subset of the FEFP funds, not a separate source of funds*

The text of section 1002.33(17)(b) makes clear that the phrase "current operating discretionary millage levy" refers to a source of funds which are

---

[4] The charter school statute was enacted in 1996 (previously section 228.056, Florida Statutes) and is now codified at section 1002.33, Florida Statutes. The additional voted-upon millage was enacted in 2001 (previously section 236.25(6), Florida Statutes) and is now codified at section 1011.71(9), Florida Statutes.

a component of the district's FEFP funds and does not include the separate "additional" millage levy authorized under section 1011.71(9), which is expressly excluded from the FEFP funds. Section 1002.33(17)(b) provides that funding for students enrolled in charter schools is limited to the sum of the school district's operating funds from the FEFP and the General Appropriations Act, and then provides examples of the subset of funds included within the FEFP and the General Appropriations Act:

> (b) The basis for the agreement for funding students enrolled in a charter school shall be **the sum of the school district's operating funds from the Florida Education Finance program as provided in s. 1011.62 and the General Appropriations Act,** *including* **gross state and local funds, discretionary lottery funds, and funds from the school district's current operating discretionary millage levy**; divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school. . . .

§ 1002.33(17)(b), Fla. Stat. (2018) (emphasis added).

Although section 1011.71(9) expressly states that revenues generated pursuant to the voted-upon millage are excluded from the FEFP funds, appellants contend that this clear legislative mandate has no bearing on whether such revenues must be shared with public charter schools. They contend that section 1002.33(17)(b) guarantees charter schools sources of funding that exist outside of the FEFP, such as the "current operating discretionary millage levy."

However, the language of section 1002.33(17)(b) indicates that the "current operating discretionary millage levy" is not a separate source of funding apart from the FEFP. Rather, as the School Board notes, the phrase is one item in a list following the word "including," which indicates that "gross state and local funds, discretionary lottery funds, and funds from the school district's current operating discretionary millage levy" are all examples of operating funds from the FEFP and the General Appropriations Act.

Appellants contend that the sources of funding listed after the word "including" in section 1002.33(17)(b) are not illustrative of sources of FEFP funding; they say the use of the word "including" exists only to clarify that public charter schools are entitled to both state *and* local FEFP funds. To support their position, appellants cite to a portion of a manual from the

Florida Department of Education regarding Funding for Florida School Districts, which states:

> Categorical program funds, which include Florida School Recognition, District Discretionary Lottery and Class Size Reduction funds, and any special allocations are added to the Net State FEFP Allocation to obtain the Total State Funding.

Based on this language, appellants claim that discretionary lottery funds do not become part of the FEFP because they are "added on top of the state's net FEFP allocation to arrive at a district's total state funding."

As the School Board points out, appellants conflate the State's "net" FEFP allocation with the total amount of school district operating funds from the FEFP. The state's contribution to FEFP funding is not limited solely to the "Net State FEFP Allocation," as evidenced by the FEFP statute, which confirms that categorical funds (which include discretionary lottery funds) are part of the overall state FEFP funds distributed to the school districts. *See* § 1011.62(6)(a), Fla. Stat. (2018). The very manual upon which appellants rely even noted that discretionary lottery funds "are added to the FEFP allocation that is distributed to the districts" and are therefore a part of the FEFP funding.

Regarding the "current operating discretionary millage levy" referred to in section 1002.33(17)(b), appellants assert that this is a source of funding existing outside of the FEFP. However, subsection (5) of the FEFP statute refers to the nonvoted-upon discretionary millage levy and contemplates its inclusion in the total amount of locally contributed funds:

> **(5) Discretionary millage compression supplement.--**The Legislature shall prescribe in the General Appropriations Act, pursuant to s. 1011.71(1), the rate of nonvoted current operating discretionary millage that shall be used to calculate a discretionary millage compression supplement. If the prescribed millage generates an amount of funds per unweighted FTE for the district that is less than the state average, the district shall receive an amount per FTE that, when added to the funds per FTE generated by the designated levy, shall equal the state average.

§ 1011.62(5), Fla. Stat. (2018). Appellants acknowledge that "[t]he compression is a part of the FEFP," but argue that "the Nonvoted Millage itself is not." We agree with the School Board that it would be odd for the State to provide, as part of the FEFP, a supplement based on a district's

current operating discretionary millage levy if that millage were not also a component of the district's FEFP funds. A logical reading of section 1002.33(17)(b) compels the conclusion that each of the items listed after the word "including" are all components of the FEFP.

Because a voted millage levied under section 1011.71(9) is excluded from the FEFP calculation and charter school funding is based on the FEFP, the millage levied pursuant to the 2018 Referendum in this case was not part of the "current operating discretionary millage" that must be shared with the charter schools. The trial court properly concluded that the Charter Schools were not entitled to a share of the revenues generated from the referendum on this basis.

## The legislative history of section 1011.71(9) does not support appellants' assertion that the School Board is required to share the 2018 Referendum revenues

After appellants filed the underlying lawsuit, section 1011.71(9) was amended to require that tax revenues generated by a voter-approved referendum be distributed to charter schools:

> (9) In addition to the maximum millage levied under this section and the General Appropriations Act, a school district may levy, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. Any such levy shall be for a maximum of 4 years and shall be counted as part of the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. **For the purpose of distributing taxes collected pursuant to this subsection, the term "school operational purposes" includes charter schools sponsored by a school district**. Millage elections conducted under the authority granted pursuant to this section are subject to s. 1011.73. Funds generated by such additional millage do not become a part of the calculation of the Florida Education Finance Program total potential funds in 2001-2002 or any subsequent year and must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year. If an increase in required local effort, when added to existing millage levied under the 10-mill limit, would result in a combined millage in excess of the 10-mill limit, any millage

levied pursuant to this subsection shall be considered to be required local effort to the extent that the district millage would otherwise exceed the 10-mill limit. **Funds levied under this subsection shall be shared with charter schools based on each charter school's proportionate share of the district's total unweighted full-time equivalent student enrollment and used in a manner consistent with the purposes of the levy**. The referendum must contain an explanation of the distribution methodology consistent with the requirements of this subsection.

§ 1011.71(9), Fla. Stat. (2019) (emphasis added).

Appellants contend that the amendment served to clarify, rather than change, the law, thereby evidencing the Legislature's intent that the voted millage funds be shared with public charter schools all along.

We reject that contention because the legislative history does not support it.

First, as the School Board notes, while the original version of the House Bill proposing the amendment to section 1011.71(9) included a section describing the proposed amendment as "amending and clarifying the use of certain voted discretionary operating millages," the final version of the bill did not include the term "clarifying." Fla. HB 7123, § 17 (2019). Appellants also rely upon a "Final Bill Analysis" published by the House of Representative's Ways & Means Committee, but that source is not persuasive because what ultimately prevails is the actual language of a statute, not the wording that did not survive the legislative process. *See GTC, Inc. v. Edgar*, 967 So. 2d 781, 789 n.4 (Fla. 2007) (noting that the Florida Supreme Court is "not unified in its view of the use of legislative staff analyses to determine legislative intent"); *Am. Home Assur. Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 376 (Fla. 2005) (Cantero, J., concurring in part and dissenting in part) (proposing that "legislative staff analyses add nothing to an investigation of legislative intent").

Second, the Legislature ultimately did not adopt language which would have made the amendment retroactive. An earlier version of the bill proposing the amendment stated: "The provisions of this act relating to ss. 1011.71 and 1002.33, Florida Statutes, amending and clarifying the use of certain voted discretionary operating millages levied by school districts, **apply to revenues collected on or after July 1, 2019**." (Emphasis added). However, Chapter 2019-42, Laws of Florida, Section 17, deleted the word "clarifying" and creates a prospective application only;

it states, "The provisions of this act relating to s. 1011.71, Florida Statutes, amending the use of certain voted discretionary operating millages levied by school districts, **apply to such levies authorized by a vote of the electors on or after July 1, 2019**." Ch. 2019-42 § 17, Laws of Fla. (emphasis added). It is clear from the context of the sentence that **all** provisions relating to section 1011.71, not just the portion pertaining to the limited use of the funds, apply prospectively.

We reject appellants' argument that section 1011.71 should be viewed as a clarification amidst a "growing controversy about whether voted operating discretionary millage revenues must be shared with the public charter schools." The Florida Supreme Court has adopted a policy of declining to rewrite legislation by viewing amendments as being "clarifications" of statutes enacted many years earlier. *See, e.g., State Farm Mut. Auto Ins. Co. v. Laforet*, 658 So. 2d 55, 62 (Fla. 1995) ("[A] clarifying amendment to a statute that is enacted soon after controversies as to the interpretation of a statute arise may be considered as a legislative interpretation of the original law and not as a substantive change. It would be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent."); *Parole Comm'n v. Cooper*, 701 So. 2d 543, 544–45 (Fla. 1997) ("[I]t is inappropriate to use an amendment enacted ten years after the original enactment to clarify original legislative intent.").

Here, the pertinent provision regarding the voted-upon millage remained unchanged from the time of its enactment in 2001 until July 1, 2019. Applying *Laforet* and *Cooper*, we conclude that it is inappropriate to consider an amendment passed 18 years after the original enactment as a clarification of the original enactment.

Finally, we have considered appellants' constitutional argument and conclude that Article IX, Section 1(a) of the Florida Constitution does not alter the statutory interpretation contained in this opinion.

*Affirmed.*

MAY, J., concurs.
GERBER, J., dissents with opinion.

GERBER, J., dissenting.

I respectfully dissent. By excluding charter schools from that portion of the current discretionary operating millage levy permitted by section 1011.71(9), as approved by voters in the 2018 Referendum, the school

- 14 -

district is violating section 1002.33(17)'s requirement that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added). *See Bank of N.Y. Mellon v. Glanville*, 252 So. 3d 1120, 1127 (Fla. 2018) ("As with any matter involving an issue of statutory interpretation, courts must first look to the actual language of the statute and examine the statute's plain meaning.") (citation and internal quotation marks omitted).

I would reverse the circuit court's final judgment, and remand for the circuit court to enter a new final judgment finding the 2018 Referendum was illegal and therefore void.

### A. *Interpreting sections 1002.33(17) and 1011.71(9) in harmony according to plain meaning favors the charter schools' position.*

The method by which students enrolled in charter schools are funded, and the sources from which such funding is derived, are provided in Section 1002.33(17), Florida Statutes (2018), entitled "Charter schools." That section provides, in pertinent part:

> (17) Funding. -- **Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, <u>the same as</u> students enrolled in other public schools in the school district**. . . .
>
> . . .
>
> (b) **The basis for the agreement for funding students enrolled in a charter school shall be <u>the sum of</u>** the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds, discretionary lottery funds, **<u>and</u> funds from the school district's current operating discretionary millage levy**; divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school. . . .

§ 1002.33(17)(b), Fla. Stat. (2018) (emphases added).

Section 1011.71, Florida Statutes (2018), entitled "District school tax," describes the sources by which "funds from the school district's operating discretionary millage levy" may be generated. That section provides, in pertinent part:

> (1) . . . [E]ach district school board desiring to participate in the state allocation of funds for current operation as prescribed by s. 1011.62(18) shall levy . . . a millage rate not to exceed the amount certified by the commissioner as the minimum millage rate necessary to provide the district required local effort for the current year, pursuant to s. 1011.62(4)(a)1. **In addition to the required local effort millage levy, each district school board <u>may levy</u> a nonvoted current operating discretionary millage**. The Legislature shall prescribe annually in the appropriations act the maximum amount of millage a district may levy.
>
> . . . .
>
> (9) In addition to the maximum millage levied under this section and the General Appropriations Act, **a school district <u>may levy</u>, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established** in s. 9(b), Art. VII of the State Constitution. . . . Funds generated by such additional millage . . . must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year. . . .

§ 1011.71(1), (9), Fla. Stat. (2018) (emphases added).

Both sections 1011.71(1) and (9) use the words "may levy" to describe how a school district may increase its operating millage above the required operating millage also described in section 1011.71(1). That is, a school board "may levy" an increased operating millage by its own vote under section 1011.71(1), or a school board "may levy" an increased operating millage by voting to place an increased operating millage on the ballot and obtaining voter approval under section 1011.71(9). The consistent use of the words "may levy" makes both increased operating millages discretionary. *See Fla. Bar v. Trazenfeld*, 833 So. 2d 734, 738 (Fla. 2002) ("The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.'").

- 16 -

Because the increased operating millages permitted by sections 1011.71(1) and (9) are both discretionary, and because a school district's "current operating discretionary millage levy" is to be included in the method of funding students enrolled in a charter school under section 1002.33(17)(b), the school district's exclusion of charter schools from the 2018 Referendum violated section 1002.33(17)'s requirement that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." *See Sch. Bd. of Palm Beach Cty. v. Survivors Charter Schs., Inc.*, 3 So. 3d 1220, 1234 (Fla. 2009) ("[W]e give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.") (citation and internal quotation marks omitted).

**B.  *The school district's arguments lack merit.***

***1.  The school district misinterprets sections 1002.33(17) and 1011.71(9) as providing two distinct funding mechanisms.  The sections are related and must be read in harmony.***

The school district argues sections 1002.33(17) and 1011.71(9) provide two distinct funding mechanisms and, therefore, section 1002.33(17) has no application to the instant case.  According to the school district, "[g]eneral funding for charter schools under [section 1002.33(17)(b)] includes a mandatory requirement that [Florida Education Finance Program] funds be distributed to charter schools," but section 1011.71(9) explicitly states "additional millage for school operational purposes" generated after a local referendum or general election "do not become part of the calculation of the Florida Education Finance Program."

The flaw in the school district's reasoning is that charter schools' general funding under section 1002.33(17)(b) does not include *only* Florida Education Finance Program components.  Rather, section 1002.33(17)(b)'s plain language provides charter schools' funding is "the sum of" three sources:  (1) "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds," (2) "discretionary lottery funds," and (3) "funds from the school district's current operating discretionary millage levy."  That sum is then "divided by total funded weighted full-time equivalent students in the school district; multiplied by the weighted full-time equivalent students for the charter school."

The flaw in the school district's reasoning arises from its misapplication of the word "including" within section 1002.33(17)(b). According to the school district, the word "including" modifies each funding component which follows – "gross state and local funds, discretionary lottery funds, and funds from the school district's current operating discretionary millage levy" – thus making each component a part of the Florida Education Finance Program formula.

However, if each funding component following the word "including" already was included in "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act," what else is the fund for students enrolled in a charter school to be "the sum of"? The question cannot be answered, because interpreting the word "including" as modifying each funding component stated within section 1002.33(17)(b) improperly renders the phrase "the sum of" as mere surplusage. *See Sch. Bd. of Palm Beach Cty.*, 3 So. 3d at 1233 ("Basic to our examination of statutes, and an important aspect of our analysis here, is the elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage.") (citation and internal quotation marks omitted).

The only logical construction of section 1002.33(17)(b) is that the word "including" modifies only its nearest reasonable referent, that is, "gross state and local funds." *See Scherer v. Volusia Cty. Dep't of Corrs.*, 171 So. 3d 135, 138 (Fla. 1st DCA 2015) ("The [nearest-reasonable-referent] canon holds simply that, whether coming before or after what is modified, modifiers (adjectives, adverbs, prepositional phrases, restrictive clauses) should be read as modifying *the nearest* noun, verb, or other sentence element to which they can reasonably be said to pertain.") (emphasis added).

Thus, the proper construction of section 1002.33(17)(b) is that the basis for the agreement for funding students enrolled in a charter school shall be *the sum of* "the school district's operating funds from the Florida Education Finance Program as provided in s. 1011.62 and the General Appropriations Act, including gross state and local funds," "discretionary lottery funds," and "funds from the school district's current operating discretionary millage levy."

As I have explained in Section A above, "funds from the school district's current operating discretionary millage levy" include increased operating millages permitted by both sections 1011.71(1) and (9).

### 2. *The school district overlooks section 1002.33(17)'s plain meaning that charter school students shall be funded by the same method as other public school students.*

The school district correctly argues that section 1002.33(17) describes the method of funding charter school students. However, the school district then argues the method of funding charter school students is not the same as the method for funding public school students, despite the plain meaning of section 1002.33(17)'s first sentence – "Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

The school district attempts to justify its disregard of the plain meaning of "the same as" by its own application the nearest-reasonable-referent canon. According to the school district:

> Applying this principle to the sentence at issue, it is clear that the modifier "the same as" must be read to modify the entire nearest **antecedent** phrase – "shall be funded as if they are in a basic program or a special program." [The charter schools] simply ignore the words "as if they are in a basic program or a special program" between "funded" and "the same as." . . . It defies logic to interpret "the same as" to modify only the first few words in the antecedent clause but not the nearer, remaining words. It would also render the words "shall be funded as if they are in a basic program or a special program" meaningless, contrary to basic principles of statutory construction. It is an "elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage." *Mendenhall v. State*, 48 So. 3d 740, 749 (Fla. 2010).

(emphasis added).

The school district misapplies the nearest-reasonable-referent canon by considering only the "nearest *antecedent* phrase." (emphasis added). As our sister court explained, the nearest-reasonable-referent canon may rely on a modifier which "com[es] *before or after* what is modified." *See Scherer*, 171 So. 3d at 138 ("The [nearest-reasonable-referent] canon holds simply that, *whether coming before or after what is modified*, modifiers

- 19 -

(adjectives, adverbs, prepositional phrases, restrictive clauses) should be read as modifying the nearest noun, verb, or other sentence element to which they can reasonably be said to pertain.") (emphasis added); *see also* Scalia and Garner, *Reading the Law: The Interpretation of Legal Texts* 152 (1st ed. 2012) (the nearest-reasonable-reference canon "applies not just to words that precede the modifier, *but also to words that follow it*.") (emphasis added).

Applying the nearest-reasonable-referent canon to section 1002.33(17)'s first sentence, the modifier "the same as" may apply to the antecedent phrase "shall be funded as if they are in a basic program or a special program," *or* may apply to the *subsequent* phrase "students enrolled in other public schools in the school district." The question is, to paraphrase our sister court, to which nearest sentence element can the modifier "the same as" reasonably be said to pertain? In my opinion, the most reasonable interpretation is that "the same as" modifies the *subsequent* phrase "students enrolled in other public schools in the district," because "the same as" draws a direct comparison to the earlier phrase "[s]tudents enrolled in a charter school."

In reaching my opinion, I have not ignored (as the school district has faulted the charter schools for ignoring) the antecedent phrase "as if they are in a basic program or a special program" within section 1002.33(17)'s first sentence. Having reviewed the charter schools' briefs, I do not believe the charter schools have ignored that phrase either.

In fact, the antecedent phrase "as if they are in a basic program or a special program" supports the charter schools' argument that charter school students are to be funded the same as other public school students. That is because "basic program" and "special program" are statutorily-defined terms which plainly apply to both charter school students and public school students.

Section 1011.61(6), Florida Statutes (2018), defines "Basic programs" as "includ[ing], but are not limited to, language arts, mathematics, art, music, physical education, science, and social studies."

Section 1003.01(10), Florida Statutes (2018), defines "Special program" as synonymous with "Alternative measures for students with special needs" and "mean[ing] measures designed to meet the special needs of a student that cannot be met by regular school curricula."

Section 1003.01(3)(a), Florida Statutes (2018), which defines "Exceptional student," elucidates what types of "special programs" exist:

"'Exceptional student' means any student who has been determined eligible for a **special program** in accordance with rules of the State Board of Education.  The term includes students who are gifted and students with disabilities who have an intellectual disability; autism spectrum disorder; a speech impairment; a language impairment; an orthopedic impairment; another health impairment; traumatic brain injury; a visual impairment; an emotional or behavioral disability; or a specific learning disability, including, but not limited to, dyslexia, dyscalculia, or developmental aphasia; students who are deaf or hard of hearing or dual sensory impaired; students who are hospitalized or homebound; children with developmental delays ages birth through 5 years, or children, ages birth through 2 years, with established conditions that are identified in State Board of Education rules pursuant to s. 1003.21(1)(e)." (emphasis added).

Based on the foregoing, I agree with the charter schools' argument that, under section 1002.33(17)'s plain meaning, "Students enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, **the same as** students enrolled in other public schools in the school district." (emphasis added).

### 3. *Contrary to both sides' arguments, the Legislature's 2019 amendment of section 1011.71(9) should not affect our interpretation of the 2018 version of section 1011.71(9).*

In 2019, the Legislature amended section 1011.71(9) to add the following language shown in bold:

> (9) In addition to the maximum millage levied under this section and the General Appropriations Act, a school district may levy, by local referendum or in a general election, additional millage for school operational purposes up to an amount that, when combined with nonvoted millage levied under this section, does not exceed the 10-mill limit established in s. 9(b), Art. VII of the State Constitution.  Any such levy shall be for a maximum of 4 years and shall be counted as part of the 10-mill limit established in s. 9(b), Art. VII of the State Constitution. **For the purpose of distributing taxes collected pursuant to this subsection, the term "school operational purposes" includes charter schools sponsored by a school district**.  Millage elections conducted under the authority granted pursuant to this section are subject to s. 1011.73.  Funds generated by such additional millage do not become a part of the calculation of the Florida

- 21 -

Education Finance Program total potential funds in 2001-2002 or any subsequent year and must not be incorporated in the calculation of any hold-harmless or other component of the Florida Education Finance Program formula in any year. If an increase in required local effort, when added to existing millage levied under the 10-mill limit, would result in a combined millage in excess of the 10-mill limit, any millage levied pursuant to this subsection shall be considered to be required local effort to the extent that the district millage would otherwise exceed the 10-mill limit. **Funds levied under this subsection shall be shared with charter schools based on each charter school's proportionate share of the district's total unweighted full-time equivalent student enrollment and used in a manner consistent with the purposes of the levy**. The referendum must contain an explanation of the distribution methodology consistent with the requirements of this subsection.

§ 1011.71(9), Fla. Stat. (2019) (emphasis added).

According to the charter schools, the 2019 Legislature's addition of the bolded sentences was meant to clarify the Legislature's intent for the 2018 Referendum's approved millage increase under section 1011.71(9) "to be shared with public charter schools all along." In support, the charter schools cite several Florida Supreme Court cases, including *Matthews v. State*, 760 So. 2d 1148 (Fla. 2000), to argue "a court may consider an amendment to a statute *soon after controversies as to the interpretation of the original act arise* as legislative interpretation of the original law. Such subsequent amendments to a statute, *which serve to clarify* rather than change existing law, are entitled to substantial weight in construing the earlier law." *Id.* at 1150 (citation omitted; emphasis added).

Here, the charter schools argue, a growing controversy existed two years earlier about whether voted operating discretionary millage revenues must be shared with public charter schools. *See Indian River Charter High Sch., Inc. v. Sch. Bd. of Indian River Cty.*, Case No. 31- 2016-CA-000432 (Fla. 19th Cir. Ct. June 13, 2017) (circuit court held the Indian River County School Board was required to share voted millage levy revenues with charter schools). Thus, the charter schools argue, the Legislature's 2019 amendment to section 1011.71(9) was meant to clarify "[i]t was the intent of the Legislature all along for Voted Millage funds to be shared with public charter schools, even under the prior version of section 1011.71(9)."

On the other hand, the school district argues the 2019 Legislature's addition of the bolded sentences necessarily means those provisions did not exist within the 2018 version of section 1011.71(9).  In support, the school district cites *Arnold v. Shumpert*, 217 So. 2d 116, 119 (Fla. 1968) ("[W]hen a statute is amended, it is presumed that the Legislature intended it to have a meaning different from that accorded to it before the amendment.").  The school district also counters the charter schools' reliance on cases like *Matthews* with other Florida Supreme Court cases holding it is inappropriate to use an amendment enacted several years after the original enactment to "clarify" original legislative intent.  *See, e.g., State Farm Mut. Auto Ins. Co. v. Laforet*, 658 So. 2d 55, 62 (Fla. 1995) ("[A] clarifying amendment to a statute that is enacted soon after controversies as to the interpretation of a statute arise may be considered as a legislative interpretation of the original law and not as a substantive change.  It would be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent[.]").

In my opinion, rather than attempting to choose one viable statutory construction canon over another in determining the 2019 amendment's effect on section 1011.71(9), we should simply interpret the 2018 version of section 1011.71(9) as written.  If we had been called upon to interpret the 2018 version of section 1011.71(9) before the 2019 amendment, we would have done so, using other statutory construction canons available for our consideration.

Also contrary to the parties' positions, the 2019 amendment's prior drafts or final bill analysis *should not* affect our interpretation of the 2018 version of section 1011.71(9).  According to the school district, the Legislature considered in an earlier bill draft, but ultimately did not adopt, language which would have made the 2019 amendment retroactive.  Instead, the Legislature included express language providing that the 2019 amendment applies prospectively, which the school district says shows the Legislature did not intend the changes to "clarify" a requirement that already applied.  On the other hand, the charter schools argue, the 2019 amendment's final bill analysis states it was intended "to *clarify* that the term 'school operational purposes' includes charter schools sponsored by a school district." (emphasis added).

The school district's reliance on earlier drafts, and the charter schools' reliance on a final bill analysis, are simply not persuasive as a matter of law.  *See Rollins v. Pizzarelli*, 761 So. 294, 299 (Fla. 2000) ("[W]hen the statutory language is clear, legislative history cannot be used to alter the plain meaning of the statute."); *American Home Assur. Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 376 (Fla. 2005) (Cantero, J., concurring

in part and dissenting in part) (proposing that "legislative staff analyses add nothing to an investigation of legislative intent").

### *Conclusion*

In sum, our review should be limited to the 2018 versions of sections 1002.33(17) and 1011.71(9), and how those statutes may be read in harmony according to their plain meaning. In my opinion, by excluding charter schools from that portion of the current discretionary operating millage levy provided in section 1011.71(9), as approved by voters in the 2018 Referendum, the school district is violating section 1002.33(17)'s requirement that "[s]tudents enrolled in a charter school, regardless of the sponsorship, shall be funded as if they are in a basic program or a special program, *the same as* students enrolled in other public schools in the school district." (emphasis added).

Based on the foregoing, I would reverse the circuit court's final judgment, and remand for the circuit court to enter a new final judgment finding the 2018 Referendum was illegal and therefore void.

\*         \*         \*

**Not final until disposition of timely filed motion for rehearing.**